**Electronically Filed
Intermediate Court of Appeals
30631
24-FEB-2011
08:15 AM**

NO. 30631

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

IN THE INTEREST OF JK

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(FC-S NO. 08-11738)

SUMMARY DISPOSITION ORDER
(By: Nakamura, C.J., and Foley and Fujise, JJ.)

Father-Appellant (Father) appeals from the "Order Awarding Permanent Custody" (Permanent Custody Order) filed on July 9, 2010, in the Family Court of the First Circuit (Family Court).[1/] The Permanent Custody Order divested Father of his parental rights over his child, JK, and awarded permanent custody of JK to the Department of Human Services (DHS). The Family Court found that Father was not presently willing and able, and it was not reasonably foreseeable that he would become willing and able within a reasonable period of time, to provide JK with a safe family home.

On appeal, Father argues that the Family Court erred in "terminating [Father's] parental rights solely because of his incarceration." We affirm the Family Court's Permanent Custody Order.

I.

At the time of the trial on the DHS's "Motion for Order Awarding Permanent Custody and Establishing a Permanent Plan"

_____

[1/] The Honorable Christine E. Kuriyama presided.

(Permanent Custody Motion), Father was incarcerated at the Saguaro Correctional Center in Arizona and had been incarcerated for five years. Father was incarcerated before JK was born. Father did not cause the harm or threatened harm to JK that prompted the DHS's involvement in this case.

Father was incarcerated on convictions for sex assault, kidnapping, and robbery. Father's "release date" is March 24, 2024.[2/] The DHS social worker testified that in the social worker's opinion, Father could not provide a safe family home for JK due to: (1) Father's long-distance and minimal relationship with JK; and (2) Father's incarceration. The DHS social worker also testified that he had concerns about (1) the violence of Father's crimes, because the sex assault and kidnapping were reportedly done at knife point; and (2) information that Father had been abusive to JK's mother (Mother) during Father's relationship with Mother.

## II.

Father cites to the Hawai'i Supreme Court decision in In re Doe, 100 Hawai'i 335, 60 P.3d 285 (2002) (hereinafter, "Doe"), in support of his argument that the Family Court erred in "terminating [Father's] parental rights solely because of his incarceration." The supreme court in Doe noted that incarceration for a criminal offense "does not mandate a per se forfeiture of a parent's rights to a child." Id. at 345, 60 P.3d at 295. The supreme court, however, went on to conclude that

> incarceration may be considered along with "other factors and circumstances impacting the ability of the parent to remedy the conditions of abuse and neglect." Thus, if the sole caretaker of a child is confined for a long period of time, the lack of permanence or guidance in the child's life may be a factor in considering whether the parent may be

---

[2/] The DHS's September 17, 2009, Safe Family Home Report states that Father's "release date is 03/24/2024." At the trial on the Permanent Custody Motion (held on July 9, 2010), Father testified: "According to my, um, watchamacall, my minimum term, it's March 24, 2023 I think. But in, uh, two years I'm up for parole." Father's testimony is confusing because if his minimum parole term was set for 2023, he would not be "up for parole" in two years.

able to provide a safe family home within a reasonable
period of time.

Id. (citation omitted).

Pursuant to Doe, although incarceration does not mandate per se forfeiture of parental rights, a parent's incarceration and the consequences of that incarceration may provide a basis for determining that a parent cannot provide a safe family home. Here, Mother stipulated to the DHS's Permanent Custody Motion and her parental rights over JK were terminated. Father has been sentenced to a lengthy term of incarceration for serious criminal offenses. The record reflects that his "release date" is in 2024. Father testified that he thought his "minimum term" was set for 2023, but also testified that he was "up for parole" in "two years." Even if Father is "up for parole" in two years from when he testified, this would mean he would be up for parole at the earliest in 2012, when JK will be approximately seven years old. JK has been in foster custody since January 2008. Although Father wanted JK placed with JK's paternal grandmother (Grandmother) while Father remained incarcerated, Grandmother testified that her own children had been removed from her custody after child protective services became involved. Grandmother also indicated that as the result of an abuse incident with her sister-in-law about "two years ago," Grandmother had been placed on probation for a year. We conclude, under the circumstances of this case, that the Family Court did not err in basing the termination of Father's parental rights on Father's incarceration.

In any event, the record reflects that Father's incarceration was not the sole basis for the termination of his parental rights. The DHS social worker, whom the Family Court found credible, testified to other factors that raised concerns about Father's willingness and ability to provide JK with a safe family home, namely, the violent nature of the crimes which resulted in Father's incarceration; information regarding Father's domestic violence during his relationship with Mother;

3

and Father's minimal relationship with JK.  These factors, in addition to Father's incarceration, provided sufficient support for the Family Court's decision to grant the DHS's Permanent Custody Motion.

III.

We affirm the "Order Awarding Permanent Custody" filed by the Family Court on July 9, 2010.

DATED:  Honolulu, Hawaiʻi, February 24, 2011.

On the briefs:

Herbert Y. Hamada
for Father-Appellant

Korrine S.S. Oki
Mary Anne Magnier
Deputies Attorney General
for Petitioner-Appellee

*Craig H. Nakamura*

Chief Judge

*Daniel R. Foley*

Associate Judge

Associate Judge